IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

01 JUN -4 PM 3: 41

**CHERYL BRENNER, MEGAN EDWARDS,
AUDREY CLOSE, MITZI FRENCH-HITTI,
CASSANDRA HUBER, NALINEE MORRIS,
and BRENDA WILSON,**

          **Plaintiffs,**

vs.                                      CIV NO. 00-01091 PJK/WWD ACE

**RAN KEN, INC., a Texas Corporation,
d/b/a CHELSEA'S STREET PUB & GRILL,
FARMINGTON LONDON PUB, INC.,
W. GREGGORY HAMILTON, an individual,
TERRY McDANIEL, an individual, and
PETER KUCH, an individual,**

          **Defendants.**

## DEFENDANT RAN KEN, INC.'S REQUESTED FINDINGS OF FACT AND CONCLUSIONS OF LAW ON ISSUE OF SUCCESSOR LIABILITY

RAN KEN Inc. submits these requested findings of fact and conclusions of law on the issue of successor liability.

### REQUESTED FINDINGS OF FACT

1. Prior to October 1, 1999, the restaurant known as Chelsea London Pub in Farmington, New Mexico, was owned and operated by the corporation known as Farmington London Pub, Inc., a New Mexico corporation. The corporation was initially owned by Greggory Hamilton, Thomas Hamilton, Bentley Hamilton and Robert McKelvey. During

1. 1998 and the first part of 1999 Farmington London Pub, Inc. had more than 15 and fewer than 101 employees at all times.

2. From 1982 to 1999 RAN KEN licensed the name Chelsea London Pub to Farmington London Pub by a license agreement. The license agreement allowed Farmington London Pub, Inc. to offer certain trademarked items on its menu, and to utilize certain trade dress, such as the interior decoration style of the restaurant.

3. Both prior to October 1, 1999, and afterwards, neither RAN KEN nor any of its shareholders, officers or directors had any ownership interest in Farmington London Pub, Inc. No shareholder, officer or director of Farmington London Pub, Inc. has ever had an ownership interest in RAN KEN, nor has any shareholder, officer or director of Farmington London Pub, Inc. served as an officer or director of RAN KEN. Similarly, no shareholder, officer or director or RAN KEN has served as an officer or director of Farmington London Pub, Inc.

4. In November of 1998, two employees of Farmington London Pub, Inc. (Megan Edwards and Cheryl Brenner) filed charges of sex discrimination with the Equal Employment Opportunity Commission, based upon the alleged actions of Farmington London Pub, Inc. employee Terry McDaniel. McDaniel was terminated in November, 1998.

5. In general, the facts which gave rise to Brenner's charge centered around her suspicion that McDaniel had spit in her coffee cup, a suspicion which she based in part on a previous disagreement she had had with McDaniel, and two prior conflicts he had had with other waitresses. An investigation was conducted to determine who might

have spit in Brenner's coffee, and no clear suspect emerged, although there appeared to be little evidence that McDaniel was responsible. Brenner resigned in late August, 1998 or early September. She contends that she was constructively discharged.

6. In general, the facts which gave rise to Edward's charge centered around her disagreements with McDaniel, a former friend of hers, and allegations of unwanted touching and foul language. McDaniel was given a final warning as a result of Edward's complaint, and was fired a few weeks later. Edwards continued to work at the restaurant.

7. Farmington London Pub, Inc. responded to the Brenner and Edwards EEOC charges on or about November 30, 1998, and the EEOC conducted an on-site investigation, interviewing a number of witnesses, in early June, 1998.

8. RAN KEN bought the restaurant assets from Farmington London Pub, Inc. on October 1, 1999. Negotiations related to the sale were initiated in the summer of 1999 and resulted in an agreement at the end of August, 1999, which then closed on October 1. The transaction was clearly an asset transaction.

9. Terry McDaniel, the Farmington London Pub, Inc. employee who is alleged to have committed all of the significant acts of harassment, never worked for RAN KEN. In addition, five of the seven plaintiffs were never employed by RAN KEN. Only Megan Edwards and Nalinee Morris were employed by RAN KEN after the sale.

10. Employees of Farmington London Pub, Inc. employed on September 30, 1999 were given an opportunity to apply to work for RAN KEN on or about October 1, 1999. The employees who began to work for RAN KEN on October 1, 1999 were required to fill

out employment applications, new W-4 forms, and other documents consistent with a newly hired employee.

11. The terms of the sale between RAN KEN and Farmington London Pub, Inc. involved a sale price for the Farmington London Pub, Inc. assets of $800,000. The sale price was ultimately paid by the tender of an $800,000 secured promissory note payable monthly, in payments of $11,707.15 over a term of seven years, with the last payment due on October 1, 2006. The balance due on this note was $766,000 as of March 2000, the date the EEOC issued its order of determination.

12. With the exception of Brenner and Edwards, no other plaintiff has filed a charge of discrimination either with a state agency or with the EEOC, in connection with the facts which give rise to their complaints in this case.

13. RAN KEN had no notice of the EEOC charges of Brenner and Edwards.

14. RAN KEN received no written notice of the EEOC charges of Brenner and Edwards at any time prior to October 1, 1999.

15. RAN KEN received no other legally sufficient notice of the EEOC charges prior to the closing of the sale of restaurant assets.

16. RAN KEN was never told, prior to October 1, 1999, when the asset sale closed, that the EEOC had conducted an on-site investigation with interviews, in connection with the two charges.

17. RAN KEN had no notice, prior October 1, 1999, of the facts of harassment alleged by any other plaintiff.

18. There is no evidence that any management level employees of Farmington London Pub who were subsequently hired by RAN KEN, discussed the EEOC charges with RAN KEN officials prior to October 1, 1999.

19. The EEOC charge information known to Farmington London Pub, Inc. prior to October 1, 1999, could not have reasonably alerted Farmington London Pub, Inc. or RAN KEN to the possible risk of claims such as the ones being asserted in the present case, in which five of the seven plaintiffs never filed EEOC charges, and appear to have been aggressively solicited to assert large claims by plaintiffs' counsel subsequent to the EEOC's determination on the Brenner and Edwards claims.

20. At the time RAN KEN purchased the assets and began operating the restaurant, it instituted detailed written policies prohibiting sexual harassment, including a detailed policy signed by all new employees which prohibited harassment, discrimination, and retaliation, required that such actions be reported, and provided a 1(800) number for reporting purposes.

21. RAN KEN instituted other significant improvements in labor practices occurred at the same time, including:

    a. Paid leave made available to employees;

    b. Health insurance made available to employees;

    c. Ending of a "shift drink policy" pursuant to which Farmington London Pub, Inc. had allowed employees to drink alcohol while on duty or have a free alcoholic drink immediately after the end of a shift.

    d.    Adoption of formal workplace employment policies and formalized training policies.

22.    RAN KEN made other significant workplace changes which effectively altered many of the key aspects of operation of the restaurant, including the following:

    a.    Institution of new inventory procedures and systems.

    b.    Institution of Food-Trak system for portion control and food supply management.

    c.    New banking relationships and insurance relationships, with new policies for reporting claims and reporting financial matters, and new credit card and check processing arrangements.

    d.    New food and drink specials, table decorations, manager requirements and store hours.

    e.    New entertainment concept adopted.

    f.    Purchasing system centralized to Austin, and food and merchandise purveyor changed.

23.    In the restaurant industry, these types of changes can materially alter the manner in which the workplace is operated, so that the business which was operated after October 1, 1999 was substantially different in fundamental ways from the business which was operated prior to October 1, 1999.

24.    There is no evidence that RAN KEN benefitted from the failure of Farmington London Pub, Inc. to have a detailed sexual harassment prevention program in place. RAN KEN instituted an effective harassment prevention program promptly upon beginning to operate the restaurant after its purchase of the assets.

25. The EEOC made a determination of probable cause for both Brenner and Edwards on or about March 2, 2000. Farmington London Pub, Inc. was given notice of the determination, and attempted to conciliate the claims, but was unsuccessful in resolving the claims of either Brenner or Edwards. RAN KEN received no notice of the determination and was not given an opportunity to participate in the conciliation.

26. After an aggressive campaign of letter writing and informational meetings, plaintiffs' counsel filed suit on behalf of seven former employees of Farmington London Pub, Inc. Only Brenner and Edwards had filed EEOC charges. Plaintiffs' counsel demanded $4.65 million to settle claims on behalf of all seven women.

27. RAN KEN, Inc. was named as a defendant, based on three theories. In connection with the two plaintiffs who were employed by RAN KEN, direct claims of retaliation were asserted. In connection with all seven plaintiffs, some claim is apparently asserted that RAN KEN, which licensed its name and trade dress to Farmington London Pub, Inc., should somehow be liable on a theory of "franchisor liability." However, the primary theory, and the one at issue here, is a theory that RAN KEN is liable as a successor, having purchased the operating assets of Farmington London Pub, Inc.

28. The sale of the of restaurant assets was for fair value, or more than fair value.

29. The assets of the corporation Farmington London Pub, Inc. were not diminished by the sale; instead, they appear to have been enhanced.

30. Farmington London Pub continues to have significant assets, primarily including the remaining unpaid balance of the note, which was in the amount of $665,444 as of March 1, 2001, and also including funds in its bank account. As of December 2000,

its end of year financial statement indicated total assets of about $710,000. Expert accounting testimony will demonstrate that equity was very nearly identical. The corporation Farmington London Pub, Inc. is as able or more able to offer the plaintiffs relief under Title VII today as it was on September 30, 1999.

31. The note given by RANKEN to Farmington London Pub, Inc. was secured by a lien on the restaurant assets, which provides protection against default and ensures that Farmington London Pub, Inc. could recover exactly what it sold in the event of a default.

32. Plaintiffs are as able today to collect any judgment they may receive against the predecessor employer and its principal Greggory Hamilton as they were prior to the sale of the restaurant assets.

## REQUESTED CONCLUSIONS OF LAW

1. Successor liability is an equitable doctrine which may be applied in certain circumstances to impose liability on a successor employer for the wrongdoing of a predecessor employer, even if the successor employer is without fault, and apparently even if the transaction was an asset transaction. However, the doctrine is dependent on the facts and circumstances of each case. "There is, and can be, no single definition of 'successor' which is applicable in every legal context. A new employer, in other words, may be a successor for some purposes and not for others." *EEOC v. MacMillan Bloedel Containers*, 503 F.2d 1086 at 1091 (6th Cir. 1974).

2. In determining when the doctrine should be applied, courts are mindful of the importance of permitting the free transfer of capital, and enabling the ready purchase and sale of businesses, particularly small businesses.

3. In considering whether the doctrine of successor liability should be applied in any given situation, the Court must consider a number of factors, which can best be summarized as notice, continuity and availability of relief.

4. Notice does not include the mere mention of EEOC charges in casual conversation, or under circumstances where the purchaser cannot appreciate the fact that the purchaser could potentially be liable to the discriminatee. None of the evidence developed in the case demonstrates that the conversations testified to by Greggory Hamilton or Bentley Hamilton rise to the level of constituting legal notice to RAN KEN.

5. Where plaintiffs are able to file suit without having filed EEOC charges because of an EEOC class determination which occurred after the sale, a purchaser of assets cannot be said to have had any notice of the five claims which were not filed charges, even if the purchaser had notice of the two filed EEOC charges. As a result, RAN KEN cannot be held to be a successor employer with respect to the claims of Morris, Huber, French-Hitti, Close or Wilson.

6. In this case the actions of plaintiffs' counsel after March 2000, have changed the situation from one involving two relatively straightforward EEOC charges to one involving seven claimants seeking several million dollars. RAN KEN cannot be said to have had notice of claims of this magnitude, and legally sufficient notice does not exist for purposes of holding RAN KEN liable as a successor.

7. "Continuity" is a short-hand way of evaluating the degree of similarity between the predecessor's business operation and the operations of the successor. Courts can look at the identity of location, product sale, work-force, business methods, and employment practices. However, the primary reason to consider continuity in evaluating whether successor liability should be imposed is to determine whether the successor has benefitted from the wrongful employment practices of the predecessor.

8. In this case RAN KEN established thoughtful employment practices which were designed to treat its work-force fairly and to prevent or remedy harassment. RAN KEN did not benefit from the poor employment practices of its predecessor and has not continued the prohibited practices, and therefore there is no continuity in this situation.

9. Other significant changes in operation of the restaurant, including financial management, food ordering, inventory control, and portion control also demonstrate a lack of continuity. Continued use of the name, trade dress, and trade-marked menu items are of little significance because these aspects of the restaurant operation had been licensed by RAN KEN to Farmington London Pub, Inc., and therefore were already owned by RAN KEN and were not an aspect of continuity.

10. Even if RAN KEN had sufficient notice, and even if there was continuity between RAN KEN's operation of the assets and its predecessor's operation of the assets, the most significant aspect of the successor inquiry is whether the discriminatees still have an opportunity to receive relief from the predecessor employer.

11. The facts in this case can be distinguished from those in *Trujillo v. Longhorn Manufacturing Company, Inc.*, 694 F.2d 221 (Tenth Cir. 1983) because here there is

no interlocking relationship between the buyer group and the seller group, which are entirely distinct, and here the predecessor employer and its principal are also defendants and are as able to provide relief as they could have in the past.

12. At the time *Trujillo* was decided, the remedies under Title VII were primarily remedial measures such as back pay and reinstatement. The Civil Rights Act of 1991, which allowed for jury trials, compensatory and punitive damages, had not yet been passed, and the consequences to the successor employer were relatively minor. As a result, courts today, faced with the large verdicts now potentially available under Title VII, should be more cautious about applying *Trujillo*.

13. Under these circumstances, it would be unjust to impose liability on RAN KEN for the mere purpose of enhancing the plaintiffs' ability to collect a money judgment and successor liability will not be imposed.

14. In applying the equitable doctrine of successor liability the primary goal is not to provide "full" relief at the expense of the successor, but to avoid "emasculation of the relief provisions of Title VII," and this Court is charged with the responsibility of "drawing the line." *(This is an alternative request, tendered in the event the Court concludes that successor liability is appropriate, but a limitation on the remedy is a fair result.)*

15. Moreover, the successor has other assets, and numerous other employees. It would be inequitable to allow the plaintiffs to reach these assets which would not have otherwise been available. Should the successor be rendered insolvent as a result of

the magnitude of the alleged claims asserted in this case, numerous other employees in other cities would lose their jobs, an inequitable and untoward result which Title VII and this doctrine would not intend. To the extent plaintiffs should be permitted to apply the successor doctrine at all, the only equitable approach would be to permit the plaintiffs to reach the assets sold by the predecessor corporation, Farmington London Pub, Inc. *(This is an alternative request, tendered in the event the Court concludes that successor liability is appropriate, but a limitation on the remedy is a fair result.)*

16. Even if successor liability is appropriate, plaintiffs should proceed first against the non-RAN KEN defendants, and then be allowed secondarily to seek judgment against RAN KEN only to the extent that the non-RAN KEN defendants are unable to satisfy the judgment. *(This is an alternative request, tendered in the event the Court concludes that successor liability is appropriate, but a limitation on the remedy is a fair result.)*

17. Any judgment against RAN KEN should be limited to the amount of judgment which would have been available against Farmington London Pub, Inc. Because Farmington London Pub, Inc. had less than 101 employees, this limits the potential verdict to $50,000 for each plaintiff of whose claims RAN KEN can be said to have had notice. This limited exposure should also be paid first through all collection first had against the non-RAN KEN defendants. *(This is an alternative request, tendered in the event the Court concludes that successor liability is appropriate, but a limitation on the remedy is a fair result.)*

12

18. Any aggregated judgment against RAN KEN should be limited (in the aggregated amount) to the amount of judgment which could have been collected against Farmington London Pub prior to October 1, 1999, because the doctrine of successor liability was not intended to make the discriminatee "better off." That amount is not more than $125,000, the amount of equity which Farmington London Pub, Inc. had on September 30, 1999. *(This is an alternative request, tendered in the event the Court concludes that successor liability is appropriate, but a limitation on the remedy is a fair result.)*

19. Punitive damages, which are intended as a deterrent, are not appropriately imposed on a successor employer and will not be imposed on RAN KEN. *(This is an alternative request, tendered in the event the Court concludes that successor liability is appropriate, but a limitation on the remedy is a fair result.)*

20. The predecessor employer (Farmington London Pub, Inc.) is still solvent, is a party to this suit, and is as able to pay a judgment as it was prior to the sale of its restaurant assets and successor liability on RAN KEN should therefore not be imposed.

21. The note payable which is the primary remaining asset of Farmington London Pub, Inc., can be paid into the registry of the Court, for the protection of the plaintiffs, in the event they should prevail against Farmington London Pub, Inc. For this reason, successor liability is inappropriate and should not be imposed against RAN KEN.

22. The note payable is collateralized with the restaurant assets, and therefore even in the event of a default, the restaurant assets can be restored to the control of the

13

corporation, leaving the predecessor corporation and the plaintiffs in at least the same situation as if no sale had occurred. For this reason, successor liability is inappropriate and should not be imposed against RAN KEN.

23. In connection with plaintiffs' non-Title VII claims, successor liability is inappropriate under New Mexico law in connection with an asset sale such as the one in this case. All such claims are therefore dismissed against RAN KEN.

24. None of the exceptions to the general rule precluding successor liability are applicable to this situation. Counts III, IV, V, VI and VII should be dismissed against RAN KEN to the extent that they are based on a principal of successor liability, as should be the components of Counts I and II which are not based upon Title VII.

SUTIN, THAYER & BROWNE
A Professional Corporation

By _____
Gail Gottlieb
Attorneys for RAN KEN, Inc.
P. O. Box 1945
Albuquerque, New Mexico 87103
(505) 883-2500
588603.wpd

We hereby certify that we have ~~mailed~~ *HAND DELIVERED* a copy of the foregoing pleading to the following:

Christopher Moody, Esq.
Noeding & Moody, P.C.
4300 San Mateo Blvd. NE #B260
Albuquerque, NM 87110

Duane Gilkey, Esq.
Gilkey & Stephenson, P.A.
PO Drawer 25566
Albuquerque, NM 87125

Alan R. Wilson, Esq.
McCary, Wilson & Pryor
6707 Academy Rd. NE
Albuquerque, NM 87109

Mary Woodward, Esq.
Miller, Stratvert & Torgerson
500 Marquette, NW, Suite 1100
Albuquerque, NM 87102

Cindy Lovato-Farmer, Esq.
Narvaez Law Firm, P.A.
500 Marquette, NW, Suite 500
Albuquerque, NM 87102

on this 4 day of June, 2001.

SUTIN, THAYER & BROWNE
A Professional Corporation

By _____